IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| GREGORY RAGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 13-3047-CV-S-ODS |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying his application for disability benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

The issues raised in this case make it unnecessary to chronicle the entirety of Plaintiff's medical history. The following summary will suffice.

Plaintiff was born in July 1973, completed high school, and has prior work experience as a laborer, landscaper, telemarketer, cook, server, and manager. He alleges he became disabled on July 20, 2007, primarily due to back pain and the aftereffects of a foot injury suffered when scaffolding fell on him on that date. X-rays taken the day of the injury revealed no fractures; Dr. Felix Meza diagnosed Plaintiff as suffering from a contusion, placed Plaintiff on crutches, and told him to take ibuprofen and prescribed Vicoden. R. at 433. Two weeks later, Plaintiff told Dr. Meza that his symptoms were improving but he still felt pain. X-rays revealed nothing remarkable and he exhibited a full range of motion. Plaintiff explained that he was not working because his employer did not have any light work available. Dr. Meza described Plaintiff's injury

as a "bone bruising" and told Plaintiff to continue the medications previously prescribed, participate in home exercises, and massage the injured area. R. at 430.

In November 2007 Plaintiff underwent a quantitative sudomotor axon reflex test (QSART) to rule out chronic regional pain syndrome (CRPS). R. at 246-47. This test was performed by Dr. George Schakaraschwili and indicated there was no restriction on Plaintiff's range of motion in the injured extremity, but there was "a high probability for the presence of dysautonomia" (which is a disorder of the autonomic nervous system) and a strong indication of "sensorimotor peripheral polyneuropathy, most likely secondary to hypothryroidism." Dr. Schakaraschwili did not specifically attribute any after-effects to Plaintiff's work-related injury. The test ruled out chronic regional pain syndrome. R. at 239-240. An MRI was performed the following week and revealed no bony or acute abnormalities, and no fluid collection, mass, or edema; the only finding of note was "diffuse fatty atrophy of the . . . muscles about the metatarsals throughout the foot." R. at 229. A subsequent meeting with an orthopedist resulted in the opinion that there was no surgical procedure called for, but that Plaintiff might benefit from nerve injections. R. at 220.

Plaintiff returned to Dr. Meza in January 2008. Plaintiff demonstrated a full range of motion in the affected ankle and his weight bearing was improved. Plaintiff reported his condition as stable and that physical therapy had not helped. Dr. Meza indicated he planned to refer Plaintiff to a podiatrist for recommendations regarding injections. R. at 308. Dr. Meza reiterated the plan to consider injections in March. R. at 306. At that point, Dr. Meza transferred Plaintiff's care to another doctor in his practice, Dr. Darrel Quick. In April, Dr. Quick indicated Plaintiff suffered from a contusion to his right foot and that diagnostic testing was "highly suggestive of sensorimotor peripheral polyneuropathy," was negative for CRPS, "but highly suggestive of dysautonomia." Dr. Quick again encouraged Plaintiff to consider injections and refilled his prescriptions (which included Lortab). R. at 303-05. In July Plaintiff still had not decided whether to have injections, and Dr. Quick refilled Plaintiff's prescriptions. R. at 301-02.

Meanwhile, in June 2008 Dr. Quick referred Plaintiff to Dr. Howard Entin for a "Psychiatric Pain Evaluation." Dr. Entin described Plaintiff's medical records as indicating a diagnosis of CRPS, even though the QSART and Dr. Quick's diagnosis

2

reflect otherwise. He adjusted Plaintiff's non-pain medication, prescribing Ambien to help with sleep and Pristiq for depression. R. at 271-75. Plaintiff saw Dr. Entin again in July, August and September, but Dr. Entin's notes do not reflect any changes in his assessment or treatment recommendations. R. at 268-70.

In August 2008 Dr. Quick referred Plaintiff to Dr. John Sacha for an evaluation and recommendation regarding Plaintiff's foot. Dr. Sacah reiterated the prior doctors' recommendation that Plaintiff undergo injections; he also described Plaintiff as being "on a poor narcotic regimen" and altered his medications. Plaintiff returned to Dr. Sacha in September for an impairment rating. Dr. Sacha noted a variety of factors, including: the negative QSART for CRPS, a relatively unremarkable EMG, Plaintiff's strength, range of motion, and other observations upon examination, and Plaintiff's refusal to consider injections – all of which led Dr. Sacha to opine that Plaintiff had reached maximum medical improvement. He assessed Plaintiff to have an eleven percent disability to the body as a whole and withheld assessing work restrictions until he received the results of a functional capacity evaluation. Dr. Sacha also reiterated his belief that Plaintiff's pain would be diminished if he underwent the injections. R. at 503-05.

Dr. Quick saw Plaintiff again on October 1, and observed Plaintiff had "significant limitations of walking. He is able to walk limited distances and has difficulty with elevations, grades, and steps." However, in his diagnosis, Dr. Quick continued to indicate that diagnostic testing was negative for radiculopathy and negative "for complex regional pain syndrome but highly suggestive of dysautonomia. Clinically, the patient probably has a significant level of sympathetically mediated pain in the right lower extremity, and possibly borderline CRPS-1." Dr. Quick also opined that Plaintiff's back pain was not attributable to any injury or other damage to his back but was probably related to his diagnosis of sympathetically mediated pain. Dr. Quick again noted Plaintiff's refusal to undergo the recommended treatment (i.e., injections of medication to block the pain). R. at 280.

On October 16, Plaintiff saw a physical therapist (Jeffrey Youngberg) for a functional capacity evaluation. The results indicated Plaintiff could perform light to medium work, but it was also noted Plaintiff put forth "very poor demonstrated effort or

3

voluntary submaximal effort which is not necessarily related to pain, impairment or disability." R. at 458-59.

In November, Plaintiff returned to Dr. Entin, who wrote that Plaintiff "has talked with Dr. Quick and requested that I take over all pain management. It is my understanding that this was authorized by Dr. Sacha and Dr. Quick." Nothing independently confirms Dr. Sacha and Dr. Quick were "surrendering" Plaintiff's pain management to Dr. Entin. In any event, Dr. Entin diagnosed Plaintiff as suffered from adjustment disorder (stable), pain disorder (stable) and reflex sympathetic dystrophy (which is another term for CRPS) and opined that an additional 3% should be added to Plaintiff's disability rating due to mental impairments. He also concluded Plaintiff needed to "stay on antidepressants, sleep medicine and pain medicine for an extended period of time." R. at 265-66.

Between November 2008 and October 2009, Dr. Entin saw Plaintiff seven times. The notes from those visits do not reflect that any diagnostic tests were performed. R. at 259-64. In November 2009 Dr. Entin completed a Residual Functional Capacity Questionnaire assessing Plaintiff's physical limitations and capabilities. He indicated Plaintiff would frequently experience pain severe enough to interfere with work, was incapable of performing even low stress jobs due to chronic pain (which would affect his attention, concentration and focus), could sit for one hour at a time before needing to change position and for only four hours a day, could stand for less than five minutes at a time and no more than two hours per day, and would need to take unscheduled breaks every hour. When asked to opine about Plaintiff's ability to lift and carry Dr. Entin declined to answer, explaining "I'm a psychiatrist." R. at 312-16.

At the hearing, Plaintiff testified that his difficulty with sitting was that he was "overwhelmed with medicine or overwhelmed with pain" and it was "hard to find a happy medium in between the two, and also the positions that I'm particularly comfortable with." As a result, he spends 95% (or more) of his time lying down with his foot elevated. R. at 44. Some days he does not get out of bed, as merely walking to the bathroom can cause his pain to flare. R. at 45-46.

The ALJ elicited testimony from a vocational expert ("VE"). The first hypothetical question asked the ALJ to assume a person of Plaintiff's age, education and experience

4

who could lift ten pounds frequently and twenty pounds occasionally, could sit for thirty minutes without interruption and for six hours a day, could stand or walk for fifteen minutes without interruption and for no more than two hours per day, could complete tasks with minimal supervision and interact with the public, and could adhere to a normal schedule but could not "tolerate a rapid pace or multitasking." The VE testified such a person could return to their past work as a telemarketer. In addition, the VE testified the individual could work as a ticket checker, ticket seller, or surveillance system monitor. However, the VE discounted the number of ticket seller positions that could be performed by 50% because sometimes the position required more standing than the hypothetical permitted. R. at 60-62.

The second hypothetical added a requirement that the person needed to elevate his leg approximately eighteen inches; the VE testified the available jobs would not change. R. at 62, 65. The third hypothetical added a requirement to the second that the person "would require reminders and redirection once or twice per day to ensure timely and accurate completion of tasks." The VE testified such an individual could not perform any work. R. at 62-63. The fourth hypothetical was the same as the second except it added a requirement that the person be permitted to lie down or rest in a reclined position up to an hour per day in addition to normal breaks. The VE testified such a person could not work in the national economy. R. at 63. Upon further questioning from counsel, the VE testified that the jobs identified in response to the first two hypotheticals would permit no more than two absences, early departures, or late arrivals per month and would not permit a five minute break every hour or the ability to shift positions at will from standing to sitting. R .at 63-64.

The ALJ found Plaintiff was limited in the manner described in the second hypothetical. Based on the VE's testimony, the ALJ further found Plaintiff could return to his past work as a telemarketer and could perform other jobs in the national economy as well. In ascertaining Plaintiff's residual functional capacity ("RFC"), the ALJ relied on the reports and opinions from Dr. Sacha, Dr. Meza, and Dr. Quick, the results of medical tests, and the functional capacity evaluation from Mr. Youngberg.

## II.  DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A.  Failure to Give Dr. Entin's Opinion Controlling Weight

Plaintiff first argues the ALJ erred in failing to give Dr. Entin's opinion controlling weight.  In making this argument Plaintiff emphasizes that Dr. Entin is a treating physician.  However, it is not clear that Dr. Entin is a treating physician – but even if he is, no error occurred.

It is true that a treating physician's opinion is entitled to deference.  This rule "is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted).  Even if Dr. Entin took over responsibility for Plaintiff's medication and pain management in November 2008, this did not transform him into a physician capable of ascertaining Plaintiff's physical capabilities.  This point is reinforced by Dr. Entin's own admission that he could not complete portions of the form asking about Plaintiff's physical abilities.

6

Second, the law does not require automatic acceptance of a treating physician's opinion. A treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., E.g., Anderson v. Astrue, 696 F.3d 790, 793-094 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Dr. Entin performed no diagnostic tests to support his opinion (probably because, as stated, Dr. Entin is a psychiatrist). Dr. Entin's conclusions, formed after approximately one year of treating Plaintiff, are also contradicted by the medical evidence originating from all the other doctors who treated Plaintiff.

This leads to the third – and most important – reason the ALJ did not err. The treating physician rule requires deference to a treating physican's opinion over the opinion of a non-treating physician. However, the ALJ in this case did not rely on the opinions of non-treating physicians. *At best*, Plaintiff has established a difference in opinion between various treating physicians. The treating physician rule does not command deference to any particular treating physician, and Plaintiff offers no other reason why the ALJ should have accepted Dr. Entin's opinion over the other treating doctors' opinions. In other words, the treating physician does not dictate *which* treating physician is owed deference.

### B. Plaintiff's Ability to Return to His Prior Work as a Telemarketer

Plaintiff argues the ALJ erred in finding that he could return to his past work as a telemarketer. He first argues the ALJ failed to make specific findings about the demands of Plaintiff's work as a telemarketer. However, the ALJ is permitted to rely on the testimony of a vocational expert regarding the demands of a claimant's prior job and whether a person with given limitations and capabilities can perform that job's duties. E.g., Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008); 20 C.F.R. § 404.1560(b)(2).

Plaintiff also contends the VE's testimony conflicts with the Dictionary of Occupational Titles ("DOT") because the duties of telemarketer conflict with a restriction of no rapid pace or multi-tasking. The DOT states a telemarketer must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or

7

diagrammatic form" and must "deal with problems involving several concrete variables in or from standardized situations." Plaintiff contends the need to deal with several variables exceeds the limitation to basic work-related decisions, but the ALJ's written order states Plaintiff "cannot tolerate a rapid pace or multi-tasking [but] can adjust to changes in a routine work environment." R. at 30. "Working with variables" seems equivalent to "adjusting to changes in a routine work environment." Ultimately, it is not so clear that there is any inconsistency between the ALJ's findings, the VE's testimony, and the DOT such that the ALJ's decision lacks support from substantial evidence in the Record.

### C. Plaintiff's Ability to Perform Other Work

Plaintiff also challenges the ALJ's finding, consistent with the VE's testimony, that Plaintiff can perform other jobs in the national economy. This point is rendered moot by the Court's conclusions with respect to Plaintiff's ability to work as a telemarketer, but the Court will address it nonetheless.

Plaintiff first argues that the position of ticket seller is classified as "light work," and Plaintiff lacks the ability to stand that is required for the full range of light work. However, Plaintiff's inability to perform the full range of light work does not mean he cannot perform particular jobs that are classified as "light" for reasons unrelated to sitting and standing. It should also be noted the VE took Plaintiff's limitations into account when she testified the number of ticket selling positions available to Plaintiff would have to be reduced.

Plaintiff next argues the ALJ failed to account for the need for a sit/stand option with respect to the position of surveillance systems monitor. This was not erroneous because there was no testimony that the number of available jobs would be eroded by such a requirement. The Court further notes this position was described as sedentary and not light. Plaintiff also reiterates his prior arguments regarding his mental ability to perform this job, but for the reasons previously stated the Court rejects this argument.

8

## III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

DATE: August 26, 2013

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT